## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **MICHAEL HUDSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 14-CV-02065-JAR** |
| | ) | |
| **LEAVENWORTH COUNTY** | ) | |
| **SHERIFF'S OFFICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Michael Hudson brings this lawsuit against the Leavenworth County Sheriff's Office (LCSO), asserting claims of discriminatory termination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981; hostile work environment under Section 1981; and retaliation pursuant to Title VII and Section 1981. This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 48). The motion is fully briefed and the Court is prepared to rule. For the reasons stated in detail below, the Court grants in part and denies in part Defendant's motion for summary judgment.

### I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom

---

[1] Fed. R. Civ. P. 56(a).

in the light most favorable to the nonmoving party.[2]   "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]   A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]   In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[7]

Once the movant has met the initial burden of showing the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]   The nonmoving party may not simply rest upon its pleadings

---

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8] *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[12]

## II.     Evidentiary Objections

The parties have objected to the admissibility of certain evidence submitted in support of and in opposition to summary judgment.  The Court first addresses these objections.  Plaintiff objects to the affidavit of Major Jeff Dedeke, which states that Major Dedeke used metadata from photographs taken on February 27, 2013 in the investigation of Plaintiff.[13]  Plaintiff argues that the affidavit and the photographs with metadata violate the best evidence rule, but does not provide a basis for application of the rule.  Major Dedeke describes the metadata in his affidavit and how he used the metadata in his investigation.  Defendant does not offer the affidavit to prove the contents of the original photographs, but to explain the use of the photographs in the investigation.[14]  Thus, the Court finds that the affidavit does not violate the best evidence rule.

---

[9] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[10] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71); *see Kannady*, 590 F.3d at 1169.

[11] *Adler*, 144 at 671.

[12] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[13] Doc. 49, Ex. 11.

[14] Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise").

Defendant objects to Plaintiff's Exhibit M,[15] an email from Wyandotte County Public Works Director Robert Roddy explaining that most streets in the county were not cleared until later in the day on February 27, 2013. Defendant argues that the email is unauthenticated and constitutes inadmissible hearsay. In considering whether a document is properly authenticated for purposes of consideration at the summary judgment stage, courts consider the "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."[16] Hearsay is any statement made by the declarant while not testifying at trial or under oath that is offered for the truth of the matter asserted.[17] Although the document may be authenticated based on the surrounding circumstances, it is inadmissible as hearsay. The statement within the email is an out-of-court statement by the declarant and Plaintiff is offering the statement to prove the truth of the matter asserted, i.e. that most roads in the county were not cleared until later in the day on February 27, 2013. Plaintiff does not provide a basis for consideration of the email as an exception to the hearsay rule. Thus, the Court will not consider this evidence at the summary judgment stage.

Additionally, Defendant objects to Plaintiff's Exhibit N,[18] which Plaintiff purports to be a letter from Sheriff Andrew Dedeke addressing an incident involving the placement of a cartoon depicting a monkey on the window of a county jail cell. Defendant contends that this letter is not authenticated. Although this letter is not printed on the Sheriff's letterhead, the

---

[15] Doc. 52, Ex. M.

[16] *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1170–71 (10th Cir. 2009) (quoting Fed. R. Evid. 901(b)(4)).

[17] Fed. R. Evid. 801(c).

[18] Doc. 52, Ex. N.

contents, substance, and other characteristics are such that the document is authenticated.[19]  The letter indicates the cell number of the inmate to whom the letter is being sent, indicates that it is coming from Sheriff Dedeke, and Sheriff Dedeke's deposition testimony indicates that he was aware of the incident.  Therefore, the Court will consider this letter for purposes of its ruling.

**III.    Uncontroverted Facts**

Plaintiff is an African-American man who resides in Wyandotte County, Kansas. Plaintiff began his employment with the Leavenworth County Sheriff's Office as a detention officer in February 2006, and was promoted to patrol deputy in October 2008.  David Zoellner was Sheriff of Leavenworth County from the time Plaintiff began his employment until 2013. In 2013, Andrew Dedeke took office as Sheriff of Leavenworth County.  From the time he was promoted to deputy until his termination, Plaintiff's supervisors included Sergeant Ed Cummings and Lieutenant Mark Metcalf.

*Workplace Comments*

In 2009, Plaintiff spoke with Sergeant Cummings about Plaintiff potentially moving to a house in Leavenworth County.  Sergeant Cummings repeatedly commented to Plaintiff, "why don't you move in that house up the street from me so when them boys start burning crosses in your yard I can come and help."[20]  Lieutenant Metcalf learned of the statement from a deputy not involved in the incident and investigated the statement by conducting interviews with Plaintiff, Sergeant Cummings, and two other officers.  As a result of the investigation, Sergeant

---

[19] *Law Co.*, 577 at 1171 (holding that district court should consider authentication factors even though letter was not printed on defendant's letterhead).

[20] Plaintiff testified in his deposition that Sergeant Cummings made this comment "all the time." Doc. 52, Ex. A at 116:7–11; 118:1–10.  Defendant offers the affidavit of Lieutenant Metcalf, which states that the investigation into the comment found that Sergeant Cummings made a comment on one occasion that  if "any . . . rednecks lit crosses on fire in his yard, he would be close to help him extinguish . . . such."  Doc. 49, Ex. 4 at ¶ 2. Viewing the evidence in the light most favorable to Plaintiff, the Court considers the comment to have been made on multiple occasions and in the way that Plaintiff stated.

Cummings was suspended without pay for three days, given a written reprimand, and ordered to attend sensitivity training.  After completing his suspension, Sergeant Cummings continued to serve as patrol supervisor on any given shift to which he was assigned, including shifts that Plaintiff served on.

In August 2012, Sergeant Cummings conducted a performance review of Plaintiff for the previous year.  Sergeant Cummings rated Plaintiff as "meets expectations," and stated that Plaintiff completed "most" of his reports on time.  Sergeant Cummings explained to Plaintiff that he did not give out "exceeds expectations" ratings.  Plaintiff had previously received "exceeds expectations" ratings and always completed his reports on time.  Thus, Plaintiff believed Sergeant Cummings had given him a bad evaluation.  Sergeant Cummings also stood behind Plaintiff at the gun range, and Plaintiff believed these actions were in retaliation for reporting Sergeant Cummings' 2009 comments.

In 2011, Plaintiff complained to another African-American employee, Officer William Francis, about the display of a confederate flag license plate on an employee's car in the LCSO parking lot.  Plaintiff and Officer Francis found the display of the license plate offensive.  Officer Francis in turn spoke with his supervisor about the incident, who then spoke to the employee who displayed the license plate.  The employee stated that she was proud to display the license plate, but agreed to remove the plate.  After learning of the incident, Sheriff Zoellner requested that Lieutenant Metcalf issue a written reprimand to Plaintiff for going outside of his chain of command and causing a potential violation of the employee's First Amendment rights.  Plaintiff signed the reprimand and it was placed in his personnel file.

Deputy Bob Smith frequently quoted a sequence of movie lines from the movie *Full Metal Jacket* to Plaintiff when the two engaged in conversation.  The sequence contained the term "Alabama blacksnake," a derogatory term used to refer to African-American male genitalia.[21]  Deputy Smith would use this term when talking to Plaintiff, sometimes on a weekly basis.[22]  The sequence also contained the phrase "all niggers must hang," which Deputy Smith stated on at least one occasion.  Plaintiff felt offended at Deputy Smith's use of the terms "Alabama blacksnake" and "nigger," but stated that he had "no grief [with Smith] other than him, you know, showing up on time."[23]  Plaintiff also heard employees refer to Deputy Silva, a Hispanic employee, as "beaner" on multiple occasions.[24]

### Off-Duty Car Policy

Defendant has a written policy concerning the off-duty use of patrol vehicles.  This written policy provides guidelines concerning the storage of patrol vehicles when officers are off-duty, but does not state that out-of-county deputies cannot take their patrol vehicles home with them.[25]  The Department does, however, have a longstanding unwritten policy that employees may not take their vehicles home if they reside outside of Leavenworth County.  Pursuant to this policy, Plaintiff was informed when he became a patrol deputy that he would

---

[21] Doc. 52, Ex. A at 178.

[22] *Id.* at 180.

[23] *Id.* at 223:25–224:23; 81:3–9.

[24] Testimony from Plaintiff and Sheriff Dedeke is conflicting as to whether anyone at LCSO ever stopped employees from referring to Deputy Silva as "beaner."  Sheriff Dedeke testified that he heard Deputy Silva ask to be called "beaner" on one occasion, but Sheriff Dedeke told him that no one would refer to him that way and Sheriff Dedeke never heard anyone refer to Deputy Silva as "beaner" again.  Doc. 49, Ex. 2 at 125:19–126:18. Lieutenant Metcalf also testified that he never heard anyone refer to a deputy as "beaner."  Doc. 49, Ex. 7 at 19:3–5.  Plaintiff testified that employees referred to Deputy Silva as "beaner" many times in front of Plaintiff and Plaintiff's supervisors, and that no one was ever disciplined for such conduct.  Doc. 52, Ex. A at 224:25–225:5.

[25] Doc. 52, Ex. A at 90:15–24.

not be allowed to take his patrol car home with him.  On December 29, 2012, Plaintiff sent an email to Lieutenant Metcalf complaining of the policy and requesting a change in the policy so that he and other out-of-county deputies could take their patrol vehicles home at night.  The email also referenced disparities in treatment between in-county and out-of-county deputies.  After Plaintiff sent this email, he requested three days off.  Lieutenant Metcalf approved one of the days off, but told Plaintiff he would need to find someone to cover his shifts for the other two days.

On February 14, 2013, Plaintiff and Deputy Clair, another out-of-county deputy, met with Lieutenant Metcalf to discuss the issues in Plaintiff's email.  At the meeting, Plaintiff discussed his requested change in the car policy and also mentioned continued harassment by Sergeant Cummings based on Plaintiff's reporting of the 2009 cross burning statements.  After this meeting, Plaintiff requested a meeting with Sheriff Dedeke on February 14, 2013, to discuss the same issues.  In attendance at this meeting were Plaintiff, Deputy Clair, Sheriff Andrew Dedeke, Major Sherley, Major Jeff Dedeke, and Lieutenant Metcalf.  At the meeting, Sheriff Dedeke stated that he agreed with the previous Sheriff on the unwritten car policy, and that he would not change the policy because of budgetary reasons.  After the meeting, Sheriff Dedeke wrote Plaintiff a letter summarizing the meeting and placed the letter in Plaintiff's personnel file.

Plaintiff called in sick on February 15 and 16, his next two scheduled shifts following his meeting with Sheriff Dedeke.  Lieutenant Metcalf called Plaintiff on February 16 and asked if he was truly sick.  Lieutenant Metcalf explained that he was concerned that Plaintiff had called in sick because he was mad about Sheriff Dedeke's decision on the car policy rather than

being sick.  Lieutenant Metcalf could not recall whether he had ever called other employees

when they called in sick.  On February 21, Plaintiff called in to work and stated that he might

not be able to come in to work that day because of a snow storm.  Lieutenant Metcalf told

Plaintiff to drive to the county line and someone would pick him up.  Plaintiff agreed, and

reported to work that day.

### February 27

On February 27, 2013, at 7:27 a.m., Sergeant Thorne sent Plaintiff a text message

requesting that Plaintiff cover Sergeant Thorne's shift later that afternoon.  Plaintiff's own shift

was scheduled to start at 3:00 p.m. that day.  Plaintiff responded to Sergeant Thorne that he was

unsure that he could make it out of his neighborhood because of another recent snowstorm in

the area.  Plaintiff then called Sergeant Cummings at approximately 9:30 a.m. and stated that he

might not make it in to work that day because his road had not yet been plowed.[26]  Sergeant

Cummings notified Lieutenant Metcalf of this call.[27]

At approximately 11:30 a.m., Plaintiff's wife sent an email to the Wyandotte County

Unified Government stating that Plaintiff's street had not been plowed, and she received a

response that their road would be cleared later in the day.  After receiving this email, Plaintiff

called Sergeant Cummings at approximately 11:31 a.m. and stated that he was going to use a

---

[26] Doc. 49, Ex. 5 at 28:20–29:4.  Plaintiff attempts to controvert this fact by alleging that he called
Sergeant Cummings at approximately 11:31 a.m. stating that he was going to use a personal day.  This, however,
does not controvert the fact that he first called Sergeant Cummings at approximately 9:30 a.m. to state that he
might use a personal day.

[27] The parties dispute whether Lieutenant Metcalf drove to Plaintiff's street after being notified by
Sergeant Cummings.  Lieutenant Metcalf testified that he drove to Plaintiff's street at approximately 10:30 a.m. and
observed the street to be clear, and that he took pictures of the road conditions.  Plaintiff testified that Lieutenant
Metcalf could not have driven down his street at 10:30 a.m. because the street was still covered in snow at that
time.

9

personal day to dig himself out of the snow.  Sergeant Cummings then notified Lieutenant Metcalf that Plaintiff was taking a personal day.

At approximately 3:21 p.m., while Plaintiff was inside his home taking a break from removing snow from his driveway, Plaintiff noticed an unmarked patrol car drive down his street.  Plaintiff called Lieutenant Metcalf and left a message regarding the unmarked patrol car checking on him.  Lieutenant Metcalf called Plaintiff back and confirmed that he had driven past Plaintiff's home.  Plaintiff asked why Lieutenant Metcalf had driven past his home, and Lieutenant Metcalf responded that Plaintiff's road was clear.  Plaintiff responded that his road was not clear when he called off at 11:30 a.m.  Lieutenant Metcalf stated that he would not debate the issue with Plaintiff, and disconnected the call.

### Professional Standards Investigation

Either Lieutenant Metcalf or Major Sherley then informed Sheriff Dedeke that Plaintiff had called off work, that Lieutenant Metcalf had driven by Plaintiff's home prior to Plaintiff calling off at 11:30 a.m., and that Lieutenant Metcalf had seen that Plaintiff's roads were clear.  Sheriff Dedeke then ordered a Professional Standards Investigation (PSI) to determine whether Plaintiff had lied on February 27 to avoid coming to work.  Major Jeff Dedeke conducted the PSI and issued a letter to Plaintiff informing him of the investigation.  As part of the PSI, Major Dedeke interviewed Plaintiff and Lieutenant Metcalf and collected evidence.  Major Dedeke asked for Plaintiff's version of events and had Plaintiff complete a handwritten statement while in Major Dedeke's office.  Plaintiff explained that he had called off at 11:31 a.m. because his street had not yet been plowed.

Lieutenant Metcalf provided digital photographs to Major Dedeke that Lieutenant Metcalf represented as showing Plaintiff's street as clear at 10:30 a.m. on February 27.  Major Dedeke did not obtain the SIM card from Lieutenant Metcalf's phone that contained the photos. However, Major Dedeke received the photos with the metadata (date and time) for the photos in an email from Lieutenant Metcalf.  Major Dedeke printed the photographs alone and as a screenshot depicting the metadata of the photographs.[28]  The metadata for the photographs indicated they were taken on February 27, 2013 from 10:40 a.m. to 10:45 a.m.

Plaintiff provided Major Dedeke with a stack of photographs in support of his version of events.  The stack of photographs was divided into four bundles, each having a date and a brief description written on the back of the top photograph in each of the four bundles.  Plaintiff represented to Major Dedeke the time frame each photograph depicted.[29]  The photographs Plaintiff submitted as depicting February 27 showed the road snow-packed and covered. Plaintiff did not provide digital copies of the photographs during the PSI, but provided digital copies during discovery.  Comparison of the photographs Plaintiff presented during the PSI with the metadata of the digital photographs produced during discovery shows that the printed photographs Hudson claimed represented February 27 were not taken on February 27, 2013.[30]

Major Dedeke concluded from the evidence that Plaintiff had lied to avoid duty, and recommended Plaintiff's termination to Sheriff Dedeke.  Sheriff Dedeke, after consulting with his command staff, made the decision to terminate Plaintiff.  Sheriff Dedeke believed that Plaintiff's alleged lie would be discoverable in subsequent criminal cases, and that he would

---

[28] Doc. 49, Ex. 11 at ¶¶ 6–7.

[29] Doc. 49, Ex. 1 at 158:12–163:17; Doc. 49, Ex. 14.

[30] Doc. 49, Ex. 14; Doc. 49, Ex. 19.

therefore not be useful as a witness.  Sheriff Dedeke had terminated Jonathan Walker, a

Caucasian officer, for lying to avoid duty on the same day.

On March 11, 2013, Plaintiff was summoned to a meeting with Sheriff Dedeke, Major

Dedeke, Major Sherley, and Lieutenant Metcalf.  Sheriff Dedeke told Plaintiff that the

investigation was over and that he had someone on Plaintiff's street around 10:30 a.m. on

February 27.  Sheriff Dedeke ordered Plaintiff to choose whether to resign or be terminated, and

Plaintiff chose to resign.

## IV.     Discussion

Plaintiff brings claims of discriminatory termination, hostile work environment, and

retaliation.  For the reasons stated more fully below, the Court grants Defendant's motion for

summary judgment as to the discriminatory termination and retaliation claims, and denies

Defendant's motion as to the hostile work environment claim.

### A.     Discriminatory Termination

Plaintiff claims that Defendant engaged in race discrimination in violation of Title VII

of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 when Defendant terminated Plaintiff's

employment.  Title VII makes it unlawful "to discharge any individual . . . because of such

individual's race, color, religion, sex, or national origin."[31]  Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties,
> give evidence, and to the full and equal benefit of all laws and proceedings for
> the security of persons and property as is enjoyed by white citizens."[32]

---

[31] 42 U.S.C. § 2000e-2(a)(1).

[32] 42 U.S.C. § 1981(a).

The elements of a plaintiff's discriminatory termination claim are the same regardless whether the claim is brought under Title VII or Section 1981.[33]  Where, as here, a plaintiff relies on circumstantial evidence to prove discriminatory termination, courts apply the three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green* and its progeny.[34]  The Tenth Circuit has described the framework as follows:

> *McDonnell Douglas* first requires the aggrieved employee to establish a prima facie case of prohibited employment action . . . If the employee makes a prima facie showing, the burden shifts to the defendant employer to state a legitimate, nondiscriminatory reason for its adverse employment action . . . If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual.[35]

Plaintiff argues that he has established a prima facie case of discrimination and that there are genuine issues of material fact regarding whether Defendant's stated reasons for Plaintiff's termination were pretextual.  Defendant counters that Plaintiff has failed to establish a prima facie case, that Defendant's stated reasons for termination were legitimate and nondiscriminatory, and that the evidence Plaintiff offers does not create a genuine dispute of fact that Defendant's stated reasons for termination were pretextual.  The Court addresses each argument in turn.

### 1.   Plaintiff's Prima Facie Case

To establish a prima facie case of race discrimination, a plaintiff must show that (1) the plaintiff belongs to a protected class; (2) the plaintiff suffered an adverse employment action;

---

[33] *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991) (citing *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285–86 (4th Cir. 1985)).

[34] *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–07 (1973).

[35] *Id.*; *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1226 (10th Cir. 2000).

and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.[36]  The prima facie case serves to eliminate the most common nondiscriminatory reasons for the plaintiff's adverse employment action, such as "lack of qualification" or "elimination of the job."[37]  However, a plaintiff's burden of establishing a prima facie case "is not onerous."[38]

Here, Plaintiff has met his prima facie burden by showing that he is a member of a protected class who was terminated under circumstances giving rise to an inference of discrimination.  Plaintiff has alleged that he was treated differently than similarly situated non-protected employees, that there are weaknesses in Defendant's non-discriminatory reasons for termination, and that decision makers involved in his termination harbored racial animus. These circumstances surrounding Plaintiff's termination give rise to an inference of discrimination.

Defendant argues that Plaintiff has failed to meet his prima facie case because he has not shown that he was qualified to perform his job at the time of his termination because he lied to avoid duty.[39]  Although Tenth Circuit cases have previously articulated a plaintiff's prima facie case as including the "qualified to perform the job" element, this is merely one way to establish a prima facie case.[40]  Another way is by showing that the plaintiff was a member of a protected

---

[36] *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

[37] *Id.*

[38] *Plotke*, 405 F.3d at 1099 (citing *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001)).

[39] Doc. 49, at 17–18.

[40] *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999) ("One way a plaintiff may establish a prima facie case of wrongful termination is by showing that: (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge.") (quoting *Lowe v. Angelo's Italian Foods, Inc.* 87 F.3d 1170, 1174–75 (10th Cir. 1996).

class who suffered an adverse employment action under circumstances giving rise to an inference of discrimination.[41]  Because Plaintiff has met this latter test, the Court finds that Plaintiff has established a prima facie case of race discrimination.

### 2. Defendant's Nondiscriminatory Reason for Termination

Once the plaintiff has established a prima facie case, the burden shifts to the defendant "to articulate through some proof a facially nondiscriminatory reason for termination."[42]  The defendant's burden at this stage is "exceedingly light."[43]  "The defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion."[44]  Here, Defendant has stated that it terminated Plaintiff because Plaintiff lied to avoid duty in violation of departmental policy.  Therefore, Defendant has met its burden at this stage.

### 3. Pretext

Under the *McDonnell Douglas* framework, a plaintiff can demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could

---

[41] *PVNF*, 487 F.3d at 800.

[42] *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992).

[43] *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999).

[44] *Flasher Co.*, 986 F.2d at 1316.

rationally find them unworthy of credence."[45]  Another way a plaintiff can establish pretext is "by providing evidence that [he] was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness."[46]  A plaintiff can also establish pretext by demonstrating racial animus on the part of the decisionmaker or someone who exerted influence over the decisionmaker.[47]  Here, Plaintiff claims that pretext exists based on the treatment of similarly situated non-protected employees, weaknesses in Defendant's reasons for termination, and racial animus on the part of the decisionmaker and those who influenced him.  The Court addresses Plaintiff's arguments in turn.

### i.       Similarly Situated Non-Protected Employees

Plaintiff contends that Defendant's treatment of similarly situated Caucasian employees who lied and were not terminated establishes pretext.  Similarly situated employees are "those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[48]  Pretext cannot be inferred where "one supervisor treats one employee one way and another supervisor treats another employee a different way, 'reasoning that different supervisors will inevitably react differently to employee insubordination.'"[49]

Plaintiff alleges that Caucasian employees were not terminated for lying about making racist statements.  Defendant counters that these employees worked in the county jail, under

---

[45] *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005), *as modified on denial of reh'g* (Dec. 20, 2005).

[46] *Kendrick*, 220 F.3d at 1232.

[47] *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 489 (10th Cir. 2006) (denying summary judgment based on remaining factual disputes concerning decisionmaker's alleged racial animus).

[48] *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1175 (10th Cir. 2006).

[49] *Id.* (quoting *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 922 (10th Cir. 2004)).

16

different supervisors than Plaintiff, and Plaintiff does not dispute this.  Thus, the Court finds these employees were not similarly situated to Plaintiff.  Plaintiff also alleges that Deputy Clair, a Caucasian employee, was not called at home when he called in sick, unlike Plaintiff. Defendant, however, alleges that it terminated Jonathan Walker, a Caucasian employee who also called off due to a snow day in February 2013, for lying to avoid duty.  Plaintiff does not dispute this.  The similarity in treatment by Defendant of a non-protected employee discharged in the same month, for the same offense, and under similar circumstances as Plaintiff undermines Plaintiff's argument that he was treated differently when he was terminated. Therefore, the Court cannot find that a genuine dispute of fact exists as to whether Plaintiff was treated less favorably than nonprotected employees who lied.

### ii.   Weaknesses in Proffered Non-Discriminatory Reasons for Termination

Plaintiff also argues that weaknesses in Defendant's non-discriminatory reasons for termination suggest that the termination was pretextual.  In determining whether weaknesses or contradictions in a defendant's stated reasons for termination establish pretext, courts "examine the facts as they appear to the person making the decision, not the plaintiff's subjective evaluation of the decision."[50]  "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[51]  Thus, a plaintiff cannot avoid summary judgment by creating a factual dispute as to whether the employer's basis for termination was wrong.[52]  Instead, the

---

[50] *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013).

[51] *Id.* at 1289.

[52] *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) ("To support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong.").

plaintiff must come forward with evidence that the employer acted in bad faith, or that the employer's asserted justification is false.[53]  A plaintiff can satisfy this burden by, for example, showing that (1) the defendant fabricated documentation relating to the termination; (2) the defendant did not follow its own written termination procedures; (3) the stated basis for termination was a *post hoc* fabrication; or (4) the defendant was not actually motivated by its stated non-discriminatory justifications.[54]

Plaintiff has not created a genuine dispute of fact concerning whether Defendant honestly believed its stated reason for termination.  Before making his decision to terminate Plaintiff, Sheriff Dedeke ordered the PSI into Plaintiff.  During the PSI, Major Dedeke asked Plaintiff to provide his version of events, and Major Dedeke reviewed photographs that Plaintiff submitted.  Major Dedeke also had access during the PSI to photographs allegedly depicting Plaintiff's street as clear on the morning of February 27.  This independent investigation and the photographs Major Dedeke relied on demonstrate that Sheriff Dedeke had a good faith basis for making his termination decision.

Plaintiff has presented evidence that Major Dedeke is a "computer guy" who can manipulate electronic data and that Major Dedeke received only digital copies of the photographs, rather than the SIM card from Lieutenant Metcalf's phone containing the photographs.  This evidence, Plaintiff argues, gives rise to an inference that Major Dedeke or Lieutenant Metcalf manipulated the metadata associated with the photographs to alter the time

---

[53] *Young v. Dillon Cos.*, 468 F.3d 1243, 1251 (10th Cir. 2006) (describing case in which court did not find pretext because "we found no evidentiary basis suggesting that the decision maker came to this belief in bad faith"); *Plotke*, 405 F.3d at 1102 ("'A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'") (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

[54] *See Young*, 468 F.3d at 1103; *Plotke*, 405 F.3d at 1102.

of day that the photographs depict.  Viewed in the light most favorable to Plaintiff, this evidence demonstrates that Defendant had the capability to fabricate or alter documentation related to the investigation.  It does not, however, create a genuine factual dispute as to whether Defendant in fact fabricated or altered the documentation.  Additionally, Plaintiff points to the email that his wife received from Wyandotte County in response to her concern that her street had not been plowed.  Even if this email provides evidence suggesting that Plaintiff's street was not clear when he called off for work, it does not create a genuine dispute of fact as to whether Defendant honestly believed Plaintiff had lied to avoid duty.

Plaintiff offers no other evidence suggesting that Defendant acted in bad faith or did not honestly believe at the time of Plaintiff's termination that Plaintiff lied.  Indeed, it is undisputed that Defendant engaged in a pre-termination investigation, that Defendant provided its justification to Plaintiff at the time of his termination, and that Defendant terminated another employee for the same reason close in time to Plaintiff's termination. Therefore, the Court finds that Plaintiff has not created a genuine dispute of material fact as to whether weaknesses or contradictions in Defendant's stated reasons for termination give rise to an inference of pretext.

### iii.    Racial Animus

Finally, Plaintiff argues that racial animus on the part of Sheriff Dedeke and those who influenced his decision gives rise to an inference of pretext.  A plaintiff may establish pretext based on racial animus by demonstrating a causal nexus between discriminatory statements and

the defendant's decision to terminate the plaintiff.[55]  "A causal nexus can be shown if the allegedly discriminatory comments were directed at the plaintiff, her position, or the defendant's policy which resulted in the adverse action taken against the plaintiff."[56]  Isolated racial comments are insufficient to establish pretext unless they can somehow be tied to the plaintiff's termination.[57]

Plaintiff alleges racial animus on the part of Sheriff Dedeke, who made the final decision to terminate Plaintiff.  Plaintiff highlighted several statements and actions that allegedly show racial animus on the part of Sheriff Dedeke.  Plaintiff's evidence suggests that (1) Sheriff Dedeke has probably made statements that President Barack Obama is a muslim and was born in Africa; (2) Sheriff Dedeke viewed the placement of a picture of a monkey on a jail window by Caucasian officers, at a time when the only two inmates were African-American, as a joke; (3) Sheriff Dedeke did not believe statements by Caucasian officers that "if five black guys raped a white woman they would claim innocence" were racially discriminatory;[58] (4) the officer who heard the comments was told to drop his complaint because "they won't make nothing of it"; (5) Sheriff Dedeke did not view as racist an email chain entitled "The Americans with No Abilities Act" that was attributed to Jesse Jackson, Al Sharpton, Dianne Feinstein, Barbara Boxer, Nancy Pelosi, Harry Reid, and Barack Obama; and (6) Sheriff Dedeke did not

---

[55] *Young*, 468 F.3d at 1253.

[56] *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994).

[57] *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006).

[58] The statement quoted does not appear in the deposition testimony that Plaintiff cites in support of his allegation.  Plaintiff cites testimony by Sheriff Dedeke that he knew of a complaint by Officer Francis referring to "inappropriate" and "off-colored" comments by other officers, but that Sheriff Dedeke would not classify the comments as racially discriminatory.  The deposition testimony of Officer Francis, however, refers to the specific statement.  Thus, drawing all reasonable inferences in favor of Plaintiff, a jury could infer that Sheriff Dedeke was aware of the specific comment.

discipline Major Sherley for responding to an email chain that contained the words "niggers" and "chinks."

These allegations do not create a genuine dispute of material fact that racial animus on the part of Sheriff Dedeke was the true motivation behind Plaintiff's termination. The only statement attributed to Sheriff Dedeke is the statement claiming President Obama is a muslim and African born. Assuming that Sheriff Dedeke did make such a statement, Plaintiff does not allege that this isolated statement was made in connection with Plaintiff's termination or that it was made in the context of the workplace. The other alleged actions also fail to establish a causal nexus between Sheriff Dedeke's animus and Plaintiff's termination. Sheriff Dedeke agreed with the investigation finding that the picture of a monkey on the jail window was a joke, but this investigation was not connected to Plaintiff in any way and occurred nearly one year after Plaintiff's termination. This remote temporal proximity and the fact that Sheriff Dedeke ordered an investigation into the incident negate any inference of racial animus by Sheriff Dedeke based on his reaction to the incident. Further, the comment by the Caucasian officers was not connected to Plaintiff's termination, was not made by Sheriff Dedeke, and Sheriff Dedeke responded to the comment by investigating it and speaking with the officers involved. Plaintiff also asserts that the comment that "they won't make nothing of it," the "Americans with No Abilities Act" email, and the email chain with the words "niggers" and "chinks" establish racial animus on the part of Sheriff Dedeke. However, Plaintiff does not allege that Sheriff Dedeke made these comments. Nor does Plaintiff suggest that Sheriff Dedeke was aware of these comments, or that they were related in any way to Plaintiff, his position, or his termination. Therefore, this evidence does not create a genuine factual dispute

as to whether racial animus on the part of Sheriff Dedeke served as pretext for Plaintiff's termination.

Plaintiff also asserts that racial animus on the part of Major Sherley, Major Dedeke, Lieutenant Metcalf, and Sergeant Cummings gives rise to an inference of pretext under the "cat's paw" or "rubber stamp" theory. Under the cat's paw or rubber stamp theory, a plaintiff can establish pretext by showing that an allegedly "biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action."[59] Thus, to proceed under the cat's paw theory, a plaintiff must show (1) racial animus, bias, or prejudice on the part of the subordinate; and (2) that the biased subordinate's reports or recommendation caused the adverse employment action.[60]

As to the first prong, Plaintiff alleges that Major Sherley's participation in the email containing the words "niggers" and "chinks," and Major Sherley's own use of such words demonstrates racial animus. Additionally, Plaintiff asserts that racial animus is shown on the part of Lieutenant Metcalf based on his investigation into Plaintiff after Plaintiff reported that another employee displayed a confederate flag license plate on the employee's car. Plaintiff also alleges racial animus on the part of Sergeant Cummings based on the 2009 cross burning comments. Finally, Plaintiff contends that Major Dedeke's racial animus is shown by his statement that President Obama is "colored black, but I think he's just as much white as he is black," and by sending the "Americans with No Abilities Act" email from his work email.

---

[59] *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 487–88 (10th Cir. 2006).

[60] *See English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1011 (10th Cir. 2001) (Assuming that investigators were prejudiced, but finding that investigators did not cause the termination).

Plaintiff has not established a genuine dispute of material fact as to racial animus on the part of Major Sherley and Major Dedeke.  The isolated statements and emails involving Major Sherley and Major Dedeke were not directed at Plaintiff or his position, and Plaintiff does not allege that they were causally related to his termination.[61]  Plaintiff has, however, created a genuine dispute of material fact as to racial animus on the part of Lieutenant Metcalf and Sergeant Cummings.  The racially charged incidents involving Lieutenant Metcalf and Sergeant Cummings were related to Plaintiff, and thus create an inference of racial animus on their part. Thus, the Court must determine whether Lieutenant Metcalf or Sergeant Cummings' involvement in Plaintiff's termination "caused the adverse employment action."[62]

Plaintiff argues that Lieutenant Metcalf and Sergeant Cummings' involvement in the events leading to his termination satisfies the causation element of the cat's paw test.  An employer can avoid liability under the cat's paw theory by conducting an independent investigation of the allegations against an employee.[63]  "Simply asking an employee for his version of events may defeat the inference that an employment decision was racially discriminatory."[64]  Lieutenant Metcalf's participation in the termination process consisted of driving past Plaintiff's house on February 27, 2013, providing evidence to the Sheriff's office for the PSI, supplying a statement for the Investigation, and being present for the termination

---

[61] *Rea*, 29 F.3d at 1457; *see also Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.*, 330 F.3d 1275, 1284 (10th Cir. 2003) (affirming grant of summary judgment because the defendant's "comments were not directed specifically at [the plaintiff], and there is no other evidence that her decision not to reinstate Burns was motivated by racial animus").

[62] *BCI Coca-Cola*, 450 F.3d at 487–88.

[63] *Id.* at 488.

[64] *Id.* (citing *Kendrick*, 220 F.3d at 1231–32).

meeting.  Sergeant Cummings' alleged involvement was limited to alerting Lieutenant Metcalf that Plaintiff intended to use a personal day on February 27, 2013.  Although Lieutenant Metcalf and Sergeant Cummings may have initially caused the PSI, Sheriff Dedeke cut off this causation by ordering an independent investigation and asking for Plaintiff's version of events.  Therefore, the Court finds that Plaintiff has not created a genuine dispute of material fact as to whether the actions of any biased subordinates caused the adverse employment action.

**B.      Racially Hostile Work Environment**

Plaintiff brings a hostile work environment claim under Section 1981.  To establish a hostile work environment claim, a plaintiff must show that (1) the plaintiff suffered racial harassment that was "pervasive or severe enough to alter the terms, conditions, or privilege of employment"; and (2) a basis exists to hold the employer liable for the hostile work environment.[65]  Plaintiff contends that material disputes of fact exist concerning whether the alleged harassment was pervasive or severe enough to create a hostile work environment, and whether Defendant can be held liable for fostering such an environment.  Defendant argues that no such dispute exists and that it is entitled to judgment as a matter of law.

**1.      Pervasiveness and Severity**

The first element of a plaintiff's hostile work environment claim has both objective and subjective components.[66]  First, the plaintiff must demonstrate subjective harassment by

---

[65] *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1139 (10th Cir. 2008); *Ford v. West*, 222 F.3d 767, 775 (10th Cir. 2000) ("To survive summary judgment under Title VII, the record must support an inference of a racially hostile work environment *and* a basis for employer liability."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998) (granting summary judgment for defendant "based on the absence of employer liability").

[66] *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 651–52 (10th Cir. 2013) *cert. denied*, 134 S. Ct. 2664 (2014).

showing that he or she perceived the environment to be abusive.[67]   Second, the plaintiff must show that the environment was objectively hostile based on several factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[68]   Here, Plaintiff has presented evidence that he subjectively viewed the work environment as hostile based on his complaints to superiors and his deposition testimony describing his reaction to racially hostile comments.   Therefore, the Court considers whether Plaintiff has created a genuine dispute of fact as to whether the work environment was objectively hostile.

Several Tenth Circuit decisions provide guidance as to the pervasiveness and severity factor under the objective component of a hostile work environment claim.   The court has held that general ridicule that is not overtly racial does not support a hostile work environment claim.[69]   Additionally, a plaintiff cannot survive summary judgment "by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs.   Instead, there must be a steady barrage of opprobrious racial comments."[70]   However, "the cumulative weight of . . . several 'isolated' racial comments" may give rise to a hostile work environment claim.[71]   Further, while pervasiveness and severity are independent factors, they are interrelated to a degree.   "A sufficiently severe episode may occur as rarely as once . . . while a relentless pattern of lesser

---

[67] *Id.*

[68] *Id.*

[69] *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).

[70] *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007); *Ford*, 222 F.3d at 777.

[71] *Tademy*, 614 F.3d at 1145 (citing *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)).

harassment that extends over a long period of time also violates the statute."[72]  Because of its highly fact-intensive nature, "the severity and pervasiveness evaluation is particularly unsuited for summary judgment."[73]

Courts can consider conduct that occurred outside the four-year statute of limitations period under Section 1981 so long as an act contributing to the hostile work environment occurred within the statutory time period.[74]  The plaintiff, however, must show that the "alleged acts constitute part of the same hostile environment."[75]  To determine whether the acts constitute the same hostile environment, courts compare the types of harassment and the parties involved in the separate acts, as well as the temporal proximity between the acts.[76]

Here, Plaintiff submitted evidence that Deputy Smith frequently quoted movie lines directed at Plaintiff that contained the words "nigger" and "Alabama blacksnake."  Plaintiff's testimony is inconsistent as to whether Smith used the term "nigger" more than once.  However, the evidence, viewed in the light most favorable to Plaintiff, suggests that Smith used the term "Alabama blacksnake" almost every time he spoke to Plaintiff, perhaps on a weekly basis. Additionally, Plaintiff offered evidence of Sergeant Cummings' 2009 comment referring to burning crosses in Plaintiff's yard.  Plaintiff claims that after he reported Cummings' comment, Cummings began harassing Plaintiff by standing behind Plaintiff at the gun range and by writing an unfavorable performance evaluation on Plaintiff.  Plaintiff also alleges that

---

[72] *Id.* at 1144.

[73] *McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 923 (10th Cir. 2001)).

[74] *Tademy*, 614 F.3d at 1152–54; *Fullwiley v. Union Pac. Corp.*, 273 F. App'x 710, 714 (10th Cir. 2008).

[75] *Tademy*, 614 F.3d at 1139.

[76] *Id.*

supervisors referred to a Hispanic deputy as "beaner" in Plaintiff's presence on multiple occasions.  Finally, Plaintiff offers evidence concerning the confederate flag license plate displayed on a co-worker's car, and the reprimand Plaintiff received from Lieutenant Metcalf after he complained about the license plate.

The Court finds that Plaintiff's evidence creates a genuine dispute of fact concerning whether the work environment at the Sheriff's Department was objectively hostile.  The evidence may not clearly establish a "steady barrage of opprobrious racial comments" by multiple actors, but the evidence is also not limited to a few "isolated" racial comments.  The evidence shows that Smith may have made directed the term "Alabama blacksnake" toward Plaintiff on a weekly basis, and that Cummings made the burning crosses comment more than once.  Cummings' burning crosses comments, made in 2009, were only one year removed from the statute of limitations period,[77] and consisted of racially charged language similar to Smith's comments.  Smith's comments were made within the statutory period.  Thus, the Court considers these comments as part of the same hostile work environment.[78]  Although the "beaner" comments were not directed at Plaintiff, these allegations also evince a racially charged atmosphere at the Sheriff's Department.  Additionally, Smith's comment that "all

_____

[77] Plaintiff filed suit on or about February 12, 2014.  Thus, the four-year statutory period began to run on February 12, 2010.

[78] *See Duncan v. Manager, Dept. of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005) (concluding that "no jury could rationally conclude that the acts [the plaintiff] alleges [were] part of the same hostile environment" because the acts involved different kinds of harassment by different employees and "eighteen years separate the initial allegations from the filing period acts").

niggers must hang" is severe enough to create an inference of a racially hostile environment without repeated utterances.[79]

The evidence also creates a genuine dispute of fact as to whether the comments unreasonably interfered with Plaintiff's work performance.  Plaintiff alleges that he felt intimidated when Cummings stood behind him at the gun range, and that Cummings did not act in the same way toward other officers.  Additionally, Plaintiff's evidence demonstrates that he felt the need to avoid Smith in the workplace because of Smith's comments.  Thus, the evidence, viewed in the light most favorable to Plaintiff, creates a factual dispute concerning whether Plaintiff's work environment was objectively hostile.

### 2.    Basis for Employer Liability

In addition to establishing the existence of a hostile work environment, a plaintiff must establish a basis for holding the employer liable for such an environment.[80]

> We have identified three bases, drawn from general agency principles, for holding an employer liable for hostile work environment based on a supervisor's or co-workers' racial harassment: (1) where the conduct occurred within the transgressor's scope of employment, (2) where the employer knew, or should have known, about the violation *and* failed to respond in a reasonable manner, or (3) where the transgressor acted with apparent authority or was aided by the agency relation.[81]

---

[79] *Tademy*, 614 F.3d at 1145 ("Far more than a mere offensive utterance, the word 'nigger' is pure anathema to African-Americans.  Perhaps no single act can more quickly . . . create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger.'") (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)).

[80] *Ford*, 222 F.3d at 775.

[81] *Id.* at 775–76; *Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001).

The second basis discussed above is essentially a negligence theory.[82]  Plaintiff asserts this theory as the only basis for holding Defendant liable for the hostile work environment.[83]

To prevail on a negligence theory, a plaintiff must demonstrate that the employer had notice of the racially hostile environment and failed to adequately respond.[84]  A plaintiff can present evidence of either actual or constructive notice to establish an employer's negligence liability.[85]  An employer has actual notice where "the plaintiff has reported harassment to management-level employees."[86]  An employer has constructive notice when "highly pervasive harassment should, in the exercise of reasonable care, be discovered by management-level employees."[87]  The adequacy of an employer's response depends on "whether the remedial and preventive action is reasonably calculated to end the harassment."[88]  The Tenth Circuit, in *Tademy v. Union Pacific Corporation*, elaborated further on the test for adequacy:

> "A stoppage of harassment shows effectiveness, which in turn evidences such reasonable calculation. However, this is not the sole factor to be considered. Because there is no strict liability and an employer must only respond reasonably, a response may be so calculated even though the perpetrator might persist."
>
> If the employer's action does not stop the harassment, then this court examines its adequacy in light of "the timing of the employee's complaint, the speed of the

---

[82] *Hollins*, 238 F.3d at 1258.

[83] Doc. 52 at 54–56.

[84] *Hollins*, 238 F.3d at 1258.

[85] *Tademy*, 614 F.3d at 1147.

[86] *Id.*

[87] *Id.*

[88] *Tademy*, 614 F.3d at 1148 (quoting *Adler*, 144 F.3d at 676).

employer's response, and the gravity of the punishment relative to the alleged harassment."[89]

Plaintiff alleges that Defendant had actual notice of the comments made by Deputy Smith because he used the terms "nigger" and "Alabama blacksnake" in front of supervisors on multiple occasions.  Defendant denies that any supervisors ever heard Deputy Smith use the term "nigger."  Plaintiff further argues that Defendant had actual knowledge of comments referring to Deputy Silva as "beaner" because supervisors frequently called Deputy Silva "beaner" in his presence.  Defendant contends that Sheriff Dedeke heard Deputy Silva refer to himself as "beaner" one time but told Deputy Silva that no one would refer to him as "beaner." Finally, Plaintiff argues that Defendant had actual knowledge of Sergeant Cummings' comments, and Defendant does not deny this.  The conflicting testimony as to whether management-level employees heard these comments creates a genuine issue of material fact concerning whether Defendant had actual notice of the allegedly hostile work environment.

Plaintiff also argues that Defendant's response to these comments was inadequate. Plaintiff contends that although Sergeant Cummings was suspended and ordered to attend sensitivity training after making the cross burning comments, Defendant allowed Sergeant Cummings to remain Plaintiff's supervisor.  Plaintiff also alleges that several supervisors heard Deputy Smith's comments and the "beaner" comments, but did nothing in response.  Defendant counters that its response to Sergeant Cummings' comments and the "beaner" comment were adequate, and denies that any supervisors heard Deputy Smith's comments.  Although Sergeant Cummings stopped making the cross burning comments after his suspension, Plaintiff has presented evidence that Cummings began standing behind Plaintiff at the gun range and gave

---

[89] *Id.* (quoting *Adler*, 144 F.3d at 676; *Duncan*, 397 F.3d at 1310).

Plaintiff a lower performance rating after the suspension.  Thus, a genuine dispute of fact exists as to whether it was reasonable for Defendant to allow Cummings to continue serving as one of Plaintiff's supervisors after his suspension.  Additionally, the conflicting testimony as to who heard Deputy Smith's comments and the "beaner" comments creates genuine disputes of fact as to whether Defendant had a duty to respond to these comments.

The Court finds that genuine disputes of material fact remain as to Plaintiff's hostile work environment claim.  The parties dispute the pervasiveness and severity of the comments contributing to the hostile work environment, as well as whether the comments interfered with Plaintiff's work performance.  The parties have also presented conflicting evidence as to Defendant's notice and response to the alleged hostile work environment.  These factual disputes, which present close questions as to each element of Plaintiff's claim, should be resolved by a jury.[90]  Therefore, the Court denies Defendant's motion for summary judgement on Plaintiff's hostile work environment claim.

### C.    Retaliation

Plaintiff also brings a retaliation claim under Title VII and Section 1981.  A plaintiff may prove retaliation with direct evidence that "retaliatory animus played a 'motivating part' in the employment decision," or indirectly by using the three-part *McDonnell Douglas* framework.[91]  Here, Plaintiff relies exclusively on the *McDonnell Douglas* approach to establish

---

[90] *See Herrera*, 474 F.3d at 683 (holding that although the evidence presented on pervasiveness of harassment "presents a close question," plaintiff had created "a genuinely disputed issue of fact as to the pervasiveness of the racially-charged hostility in this work environment").

[91] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225).

his retaliation claim.[92]   The parties here dispute whether Plaintiff has made his prima facie case and whether genuine disputes of material fact exist concerning pretext.

### 1.     Plaintiff's Prima Facie Case

To establish a prima facie case of retaliation, Plaintiff must show that (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.[93]

Protected opposition "can range from filing formal charges to voicing informal complaints."[94]  "A plaintiff need not convince the jury that his employer had actually discriminated against him; he need only show that when he engaged in protected opposition, he had a reasonable good-faith belief that the opposed behavior was discriminatory."[95]  Plaintiff contends that he engaged in protected opposition on several occasions.  First, he points to the email he sent to Lieutenant Metcalf on December 29, 2012, complaining about the Department's off-duty car policy.  Second, Plaintiff alleges that he mentioned that Sergeant Cummings was still retaliating against him for the 2009 burning crosses comments in a meeting with Lieutenant Metcalf concerning the car policy.  Third, Plaintiff argues that his meeting with Sheriff Dedeke concerning the car policy constituted protected opposition.  Finally, Plaintiff alleges that during the PSI conducted by Major Dedeke, he complained of continued retaliation by Sergeant Cummings and Lieutenant Metcalf.

---

[92] Doc. 52 at 56.

[93] *O'neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001).

[94] *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

[95] *Id.* at 1015–16; *see Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) ("Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the ADEA.").

Plaintiff's December 29, 2012 email to Lieutenant Metcalf and the meeting with Sheriff Dedeke do not constitute protected opposition. Nowhere in the email or in the meeting with Sheriff Dedeke did Plaintiff mention differential treatment based on race concerning the off-duty car policy. Plaintiff's concerns related to differences in treatment between officers who lived within Leavenworth County and those who lived outside the county, rather than differences based on race. The complaints during Plaintiff's meeting with Lieutenant Metcalf and during the PSI about continued harassment by Sergeant Cummings, however, do constitute protected opposition.[96] Plaintiff believed that Sergeant Cummings' conduct was motivated by Plaintiff's reporting of the 2009 burning crosses statement. This belief was reasonable based on Plaintiff's reporting of Sergeant Cummings' comments and his understanding that Sergeant Cummings did not stand behind others at the gun range. Therefore, the Court must determine whether these instances of protected opposition caused any adverse employment action against Plaintiff.

Plaintiff alleges several instances of materially adverse employment actions. First, Plaintiff contends that after he sent the December 29, 2012 email, Lieutenant Metcalf began denying his vacation requests. Second, Plaintiff alleges that after his meeting with Sheriff Dedeke and other supervisors regarding the Department's off-duty car policy, Sheriff Dedeke placed a negative letter in Plaintiff's personnel file. Third, Plaintiff contends that the investigation into his use of a personal day on February 27, 2013 constituted an adverse

---

[96] Plaintiff's complaint during the PSI about retaliation by Lieutenant Metcalf does not constitute protected opposition. Plaintiff complained that Lieutenant Metcalf retaliated based on Plaintiff's complaints concerning the car policy, rather than based on complaints about race discrimination or complaints about Sergeant Cummings' comments. Doc. 52, at 57–58. Thus, Plaintiff's complaint about Lieutenant Metcalf does not constitute protected opposition.

employment action.  Finally, Plaintiff argues that his constructive discharge on March 7, 2013

constituted an adverse employment action.

Plaintiff's constructive discharge is the only materially adverse employment action out

of the events described above.  To determine whether an employment action is adverse for

purposes of a retaliation claim, courts apply the "reasonable employee standard."[97]  Under this

objective standard, "a plaintiff must show that a reasonable employee would have found the

challenged action materially adverse."[98]  Although courts construe the phrase adverse

employment action liberally, the action must amount to "a significant change in employment

status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or . . . causing a significant change in benefits."[99]  "Mere inconveniences or

alterations of job responsibilities do not rise to the level of an adverse employment action."[100]

Thus, Plaintiff's denial of personal days was not an adverse employment action.  Further, the

letter placed in Plaintiff's file was merely a summary of the conversation between the parties

rather than a letter of reprimand.  However, even assuming the letter was meant as a reprimand,

a letter of reprimand generally does not constitute an adverse employment action without

further action by the employer.[101]  Additionally, the PSI does not constitute an adverse

---

[97] *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008).

[98] *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

[99] *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998)).

[100] *Id.*

[101] *See Rennard v. Woodworker's Supply, Inc.*, 101 F. App'x 296, 307–08 (10th Cir. 2004) (holding that letter of reprimand did not constitute adverse employment action where employer did not take any other action against plaintiff in connection to reprimand).

employment action.[102]  Thus, the only materially adverse employment action was Plaintiff's

constructive discharge.[103]

Having found that Plaintiff's complaints about Sergeant Cummings during his meeting

with Lieutenant Metcalf and during the PSI constituted protected opposition and that Plaintiff's

constructive discharge was the only materially adverse employment action in this case, the

Court must assess the causal connection between these two events.  To satisfy the causation

element of his prima facie case, Plaintiff must show "evidence of circumstances that justify an

inference of retaliatory motive, such as protected conduct closely followed by adverse

action."[104]  A showing of close temporal proximity between the alleged events, in itself, may

satisfy the causation requirement.[105]  The Tenth Circuit has held that a one and one-half month

period between events may establish causation, while a three-month period, standing alone, is

insufficient to establish causation.[106]  Plaintiff alleges that twenty five days passed between his

complaint about Sergeant Cummings during his meeting with Lieutenant Metcalf and his

constructive discharge, and that four days passed between his complaint during the PSI and the

---

[102] *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1243 (10th Cir. 2009) ("An investigation of potential misconduct, as already noted, will generally not constitute an adverse employment action."); *Miller v. Maddox*, 51 F. Supp. 2d 1176, 1189 (D. Kan. 1999) (holding that investigation into employee's potential misconduct, although inconvenient, was not an adverse employment action).

[103] *McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 716 (10th Cir. 2011) ("Termination of employment is clearly an adverse employment action.") (quoting *Fye*, 516 F.3d at 1228).

[104] *O'Neal*, 237 F.3d at 1253 (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)).

[105] *Id.*

[106] *Id.*

constructive discharge.[107]  This period satisfies the causation element of Plaintiff's prima facie case.

### 2.      Pretext

Having satisfied his prima facie case, Plaintiff must also meet his burden of demonstrating that Defendant's asserted reasons for his termination were pretextual.  Plaintiff asserts many of the same bases for pretext in his retaliation claim as he does in his discriminatory termination claim.  The Court has found, *supra*, that these bases do not create a genuine issue of material fact that Defendant's reason for termination was pretextual.  Plaintiff also contends that similar investigations into the use of sick leave and alleged misconduct by Officer Francis, another African-American officer, establish pretext.  These investigations, however, took place nearly a year after Plaintiff's termination, and Plaintiff does not contend that these investigations were retaliatory.[108]  Further, the adverse employment action in this case was preceded by an independent investigation, and Defendant took the same action against an employee who had engaged in protected conduct.  Therefore, the Court finds that no genuine dispute of material fact exists as to whether Defendant's stated reasons for termination served as pretext for its stated reason for discharging Plaintiff.

## V.      Conclusion

The Court finds that no genuine disputes of material fact exist as to Plaintiff's discriminatory termination and retaliation claims.  Plaintiff has not presented evidence sufficient to create an inference that Defendant's stated reason for termination was pretext for race

---

[107] Doc. 52 at 60.

[108] Plaintiff states in his Response that the investigations into Officer Francis occurred after he testified in his deposition about discrimination by Defendant.  Doc. 52 at 60.  Plaintiff, however, does not state that the investigations were retaliatory.  Further, the affidavit Plaintiff relies on to describe the investigation does not mention Officer Francis' deposition or allege that the investigation took place after the deposition.  Doc. 52, ex. O.

discrimination or retaliation.  The Court finds, however, that genuine disputes of material fact remain as to Plaintiff's hostile work environment claim.  The conflicting evidence as to the pervasiveness and severity of the alleged comments, as well as the notice Defendant had of the comments, is a genuine dispute of fact that should be resolved by a jury.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 48) is granted in part and denied in part.  The motion is **granted** as to Plaintiff's discriminatory termination and retaliation claims, and **denied** as to Plaintiff's hostile work environment claim.

**IT IS SO ORDERED.**

Dated: November 4, 2015

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE